413 S.E.2d 611 (1992)
TAZEWELL OIL COMPANY. INC.
v.
UNITED VIRGINIA BANK/CRESTAR BANK
v.
UNITED VIRGINIA BANK/CRESTAR BANK
v.
TAZEWELL OIL COMPANY, INC.
Record Nos. 910299, 910301.
Supreme Court of Virginia.
January 10, 1992.
As Amended February 28, 1992.
*613 Thomas W. McCandlish, Wyatt B. Durrette, Jr., Richmond (David D. Hopper; Barrett E. Pope, Mezzullo & McCandlish; Durrette, Irvin Lemons & Fenderson, on briefs), for appellant Tazewell Oil Co., Inc.
S.J. Thompson, Jr., Leighton S. Houck, Lynchburg (Joy Lee Price, Caskie & Frost, on brief), for appellee United Virginia Bank/Crestar Bank.
Present: CARRICO, C.J., COMPTON, STEPHENSON, WHITING, LACY and KEENAN, JJ., and POFF, Senior Justice.
*612 LACY, Justice.
In these two cases, the execution by two lien creditors of their agreement to liquidate their security by seizing their debtor's accounts receivable and inventory has generated a number of legal issues. The primary issues involve one creditor's liability for conspiracy, the effect of releases with other tortfeasors on that creditor's liability and on its right to reduction of the recovery award by the amounts paid pursuant to the releases, and the trial court's treatment of compensatory and punitive damages.
According to settled principles of appellate review, we will view the facts in the light most favorable to the debtor which received jury verdicts in its favor which were confirmed by the trial court. In 1981, Southside Oil Company, Inc. (Southside), a wholesale petroleum product distributor in South Boston, borrowed money from the South Boston branch office of United Virginia Bank (UVB) to buy and operate another distributor's business in South Boston.[1] Tucker W. McLaughlin, an officer of Southside and its sole stockholder, dealt with Douglas V. Bowman, president of the UVB branch in South Boston.
The initial banking relationship was satisfactory and expanded as UVB financed other Southside acquisitions and operations *614 of similar corporations in other parts of Virginia. Southside acquired the capital stock of those corporations, and McLaughlin became an executive officer in each of them, but left their management to local personnel.
Because Southside provided the operating capital for the acquired corporations, however, McLaughlin made financial arrangements in his capacity as an executive officer for Southside and its affiliates. While doing so, McLaughlin personally guaranteed payment of the loans and frequently used the assets of one or more of the affiliates as security for another affiliate's debt.
One of Southside's acquisitions was Tazewell Oil Company, Inc. (Tazewell), a highly profitable petroleum distributorship that had been operated for Tazewell in the Buchanan County area for a number of years by S.M. Raines through his corporation, Raines, Inc. (collectively Raines). Raines continued in the same relationship after Southside acquired Tazewell.
In September 1983, McLaughlin's corporations began to withdraw large sums of money from Tazewell to finance McLaughlin's unrelated business enterprises. These withdrawals caused McLaughlin's corporations to issue checks for which there were insufficient funds in their UVB bank accounts and to default in some of their principal and interest payments.
Additionally, some of McLaughlin's corporations failed to pay their suppliers. As a consequence, UVB had to pay those suppliers large sums that it had guaranteed on its letters of credit issued to suppliers on those corporations' accounts. The corporations and McLaughlin were unable to reimburse UVB, thereby increasing their indebtednesses to UVB.
Because UVB had paid, and was continuing to pay, a number of checks issued by McLaughlin's corporations for which they had insufficient funds, UVB requested, and twice McLaughlin furnished, additional collateral in which third parties already had interests. In July 1984, the last time additional collateral was furnished, UVB accepted it with the agreement that it would give 10 days' written notice of a default in any of McLaughlin's corporations' loans before taking "action to realize on the collateral."
On November 29, 1984, UVB paid $150,000 on another letter of credit it had issued for one of McLaughlin's corporations. Again, McLaughlin told UVB it could not repay the amount. On November 30, Bowman told McLaughlin that he would "work with [McLaughlin] to try to ... work out a plan [for McLaughlin to pay it back]." Yet, just after their conversation, Bowman wrote to McLaughlin making demand for immediate payment of all sums McLaughlin's corporations owed UVB. The letter concluded with the following language:
You have repeatedly advised us that these debts can be taken care of and we are still hopeful that this matter can be worked out. In the meantime, however, we have felt it necessary in order to protect the proper interest of the bank to make the demand set forth in this letter.
Despite its demand in the November 30 letter, UVB continued to extend credit to McLaughlin's corporations, to accept partial payments of principal and interest, and to discuss McLaughlin's proposals to make deferred payments on the various debts to UVB. Although Tazewell failed to keep a number of its payment promises, UVB did not repeat its demand for immediate payment of all of McLaughlin's corporate indebtednesses during their many contacts during this period. Tazewell, however, kept its interest payments current and made principal curtailments amounting to approximately $30,000 a month, thereby reducing its indebtedness to UVB from $1.1 million to $914,000 at the end of May 1985.
Southside also owned and operated Cardinal Fuels, Inc. (Cardinal), another petroleum distributorship which operated in Buchanan County. In January 1983, Miners and Merchants Bank (M & M) in Grundy loaned Cardinal $250,000. This debt was evidenced by demand notes secured by Cardinal's accounts receivable.
In the fall of 1984, M & M lost a substantial part of its security. This loss occurred *615 for two reasons. First, Cardinal's manager resigned, became its competitor, and took a number of Cardinal's customers with him. As those customers' accounts were paid, there was no corresponding reduction in Cardinal's debt to M & M. Second, the accounts receivable of those customers who stayed with Cardinal were taken over by Tazewell upon its assumption of Cardinal's operation after its manager's departure. Many of these accounts were then commingled with the Tazewell accounts receivable.
To replace M & M's loss of collateral, McLaughlin offered additional security, including a subordinate lien on Tazewell's accounts receivable and equipment. In January 1985, M & M's president, James G. Graham, called UVB, the first lien holder, apparently for further information. Graham spoke with Bowman in South Boston. Bowman's pencilled notes of their telephone conversation indicated that Cardinal owed M & M $215,000, that M & M had a security agreement on Cardinal's accounts receivable, and that Cardinal's manager had recently left and was operating a competing business.
On February 8, 1985, M & M and McLaughlin entered into a written agreement in which McLaughlin agreed to "pledge" the accounts receivable and equipment of both Cardinal and Tazewell to secure payment of Cardinal's debt, which was to be reduced at the rate of $5,000 monthly, plus interest. The agreement also contained these provisions:
(8) [M & M] agrees to the modification of payment terms of this debt subject to receipt of complete itemized equipment lists of [Tazewell and Cardinal]. Our acceptance of this agreement is further subject to appraisal of this equipment and a determination that the equipment pledged is of adequate value to secure the debt.... If the bank deems that adequate security has not been pledged after an evaluation of the equipment, this agreement is null and the liens will be released. Confirmation of the equipment appraisal and acceptability will be made by letter at a later date.
(9) In the event that Cardinal Fuels Inc. or Tazewell Oil Company, Inc. or Southside Oil Company, Inc. or any subsidiaries violate any of the terms of this agreement, the Cardinal Fuels Inc. debt will become due and payable in full, if the company remains in default 15 days after written notification.

(Emphasis added.)
After the February 8 agreement, Tazewell executed appropriate security agreements granting M & M a lien, subordinate to UVB's lien, upon Tazewell's accounts receivable. McLaughlin did not furnish the itemized equipment lists, however, as required in paragraph 8 of the agreement.
Shortly after the February 8 agreement was signed, Bowman learned that Cardinal's indebtedness to M & M had been rescheduled to provide for monthly installment payments of $5,000, plus interest. On Friday, May 30, Bowman had his second telephone conversation with Graham in which Graham told Bowman that Raines was terminating its relationship with Tazewell to become one of its competitors. Graham sought to determine from Bowman the status of Tazewell's account with UVB. During one of their later telephone conversations that day, Bowman also learned that McLaughlin was negotiating the sale of Tazewell to Raines. Despite this change in Tazewell's situation, Graham told Bowman that M & M "ha[d] no idea of moving to try to protect [its] interest unless there was an agreement that could be reached between [M & M and UVB]."
Because Tazewell's accounts receivable represented a substantial part of UVB's security for the payment of McLaughlin's corporations' indebtedness of over $900,000, these developments became of concern to Bowman. First, Bowman feared that Tazewell might file a petition for relief under Chapter 11 of the Bankruptcy Act that could delay collection of UVB's debt. Second, Bowman was concerned that Tazewell's "good" accounts receivable, due at the end of May 1985, would be paid shortly after June 1 without reducing Tazewell's debt, and no sales would be made to replace those accounts, which would result in *616 the loss of a substantial part of UVB's security.
In their telephone conversations that day, each banker, without elaboration, assured the other that he had given "notice" to permit a seizure of the collateral in Tazewell's possession. As it turned out, neither banker had given a notice that was sufficient.
Bowman had sufficient information to indicate that Cardinal might be current in its installment payments of principal and interest to M & M through the end of May. Yet, without further inquiry, he accepted Graham's bare statement that Cardinal was in default in its repayment agreement and that "notice" had been given. Nor did Bowman question Graham's apparently inconsistent information that Cardinal's obligation was then a demand note of $185,000, rather than the installment obligation of February 8.
On that Friday afternoon, Bowman and Graham agreed to a plan to liquidate their respective collateral by immediate seizure of Tazewell's accounts receivable and inventory. Additionally, UVB agreed that M & M's attorney, H.A. Street, would act for both M & M and UVB in filing the necessary proceedings to seize Tazewell's accounts receivable and inventory.
The pertinent terms of the seizure agreement are set forth in UVB's May 31, 1985 letter to M & M as follows:
In consideration of the payment by you to us of $15,000.00, we have agreed to certain matters concerning the liquidation by you of inventory and receivables of Tazewell Oil Company which are subject to liens in favor of [UVB and M & M] to secure obligations of that company. Specifically, we hereby request that you take possession of inventory of Tazewell Oil Company and make a commercially reasonable disposition of the same on our behalf as provided in the security documents, copies of which are enclosed....
We further agree that you will proceed to liquidate and collect receivables of Tazewell Oil Company under your security documents even though they are subject to liens securing debts owed United Virginia Bank and will promptly remit to us the first $140,000.00 as it is collected by you. Thereafter, you will recover for your own account the secured indebtedness owed to you in the approximate amount of $186,000.00, together with reasonable expenses related to this matter. All amounts subsequently recovered, net of reasonable expenses, will be paid to us to be applied to the secured indebtedness.
Accordingly, on Monday, June 3, 1985, Street filed a suit for M & M in the Circuit Court of Buchanan County against Cardinal, Tazewell, Grundy National Bank (Grundy) (Tazewell's depository), and the account debtors of Cardinal and Tazewell. As pertinent to this case, M & M sought: (1) to enjoin Cardinal and Tazewell from collecting their accounts receivable; (2) to require Cardinal's and Tazewell's debtors to pay their indebtednesses into court; and (3) to enjoin Grundy National Bank from honoring Tazewell's checks on its accounts with Grundy. Street also had deputy sheriffs serve "legal" notices on Tazewell's debtors not to pay Tazewell and on Grundy not to honor Tazewell's checks.
On the same day and in the same court, Street filed a suit for UVB against Tazewell and Raines to enjoin Tazewell from disposing of any of its inventory covered by UVB's lien, and for alternative relief. Neither bill of complaint mentioned the May 31 agreement between M & M and UVB.
Late Monday afternoon, Graham told McLaughlin that the banks were "going after the accounts receivable." The next morning, McLaughlin discovered that the suits had been filed and that the "legal" notices had been, or were being, served on Tazewell's customers and Grundy.
As a result, Tazewell and Cardinal were "put out of business" because "they didn't have any cash, ... any inventory ... [or] any accounts receivable." Therefore, McLaughlin was compelled to sell Tazewell's inventory and rent its assets to Raines for sums substantially less than *617 their value prior to the filing of the suits and the service of the notices.
UVB and M & M filed other actions against McLaughlin's corporations and the endorsers and guarantors of their indebtednesses to those banks. In turn, those parties filed various actions against those banks and Grundy asserting a number of causes of action. All the cases were consolidated for trial by jury and a number of them were dismissed during the trial.
At the conclusion of all the evidence, Grundy paid Tazewell and other parties $73,500 to release it from liability for its alleged wrongful failure to honor Tazewell's checks after receiving M & M's notice. Shortly thereafter, M & M paid Tazewell and other parties $400,000 to release it from a number of claims.
The remaining cases went to the jury upon: (1) Tazewell's claim that UVB conspired with M & M to injure the trade and business of Tazewell; (2) Tazewell's claim that UVB had tortiously interfered with its February 8 agreement with M & M; and (3) UVB's claim that McLaughlin and some of his corporations owed it $358,748.71 for unpaid loans, as alleged in an action UVB had filed against them. The jury returned verdicts against UVB on all three issues, awarding compensatory damages of $300,000 each on the conspiracy and tortious interference counts and $300,000 punitive damages on the tortious interference count.[2]
The court denied UVB's post-trial pleas of release based on the Grundy and M & M settlements, entered judgment on the conspiracy verdict, trebled the damages to $900,000 as provided in Code § 18.2-500(a), and reduced that award by $473,500, the total of the settlement amounts. Also, the court awarded attorney's fees and costs to Tazewell's counsel as authorized by Code § 18.2-500(a).
The court concluded that the evidence supported the verdicts for compensatory and punitive damages on the tortious interference issue. The court did not enter judgment on that claim, however, because "there was no evidence to support a combined compensatory verdict of $600,000 [and the] damages awarded on the tortious interference count, both compensatory and punitive, are included in the damages awarded under the conspiracy count."
We awarded appeals to both UVB and Tazewell and consolidate them for consideration here.

I. UVB'S APPEAL, RECORD NO. 910301
UVB contends that the judgment for damages against it should be set aside and judgment entered in its favor because Tazewell's release of M & M and Grundy also released UVB. Also UVB contends that the evidence was insufficient to support the verdicts. Alternatively, UVB argues that the judgment should be set aside and a new trial granted because of errors by the trial court regarding consolidation of the cases, testimony of expert witnesses, jury instructions, attorney's fees, and discovery requests. We consider these arguments in order.[3]

A. SETTLEMENTS OF OTHER CASES
UVB asserts that Tazewell's settlements with M & M and Grundy do not meet the requirements of Code § 8.01-35.1, the covenant not to sue statute, and, therefore, are subject to the common-law rule that release of one tortfeasor releases the other tortfeasors. First, UVB argues that, as the statute applies only to the release of tort liability, it does not apply where both tort and contract liability are released, as in this case. We disagree. There is no requirement of separate documents for the release of contract and tort claims. Consolidation of them in a single document does not defeat an otherwise valid compliance with Code § 8.01-35.1 as to the tort claims.
*618 Next, UVB contends that Tazewell's promise, recited in the settlement document, not to appeal the trial court's ruling regarding its conspiracy count against Grundy was neither a release nor a covenant not to sue covered by Code § 8.01-35.1. We agree. But UVB offers no authority, and we find none, that supports its position that such an agreement is, nevertheless, a common-law release or common-law covenant not to sue and, thus, subject to the common-law rule.
Finally, UVB argues that, although the releases "purported to be in conformity" with Code § 8.01-35.1, they were drafted to "harass and prohibit the court from implementing the requirements" of the section and constituted bad faith. The M & M release provides that only the $15,000 allocated to settlement of the conspiracy charge could be used to reduce the recoveries of the releasors against other parties. This restriction, UVB asserts, prevents the court from considering the amounts paid in settlement in the exercise of its duty under Code § 8.01-35.1 to determine "the amount for which judgment shall be entered."
We do not regard this as an act of bad faith. Indeed, the statute contemplates that a court may have to choose between "the amount stipulated by the covenant or release, or in the amount of the consideration paid for it, whichever is the greater." Code § 8.01-35.1(A)(1).
Therefore, we hold that the court correctly denied UVB's pleas of release.

B. CONSPIRACY CHARGE
Next, we consider UVB's contention that the evidence was insufficient, as a matter of law, to sustain the jury's finding that UVB engaged in a conspiracy to injure Tazewell's business in violation of Code § 18.2-499(a). As pertinent, the statute provides:
Any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever ... shall be jointly and severally guilty of a Class 3 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.
Code § 18.2-500(a) provides in pertinent part:
Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel.
UVB asserts that its motive was "simply to collect the debts that were owed to it" by Tazewell, and a finding that UVB's actions were undertaken to destroy Tazewell, thereby forestalling it from filing Chapter 11 bankruptcy proceedings, is "sheer speculation."
Tazewell responds that UVB's actions were directed to the destruction of Tazewell and points to five evidentiary areas as support for its conspiracy count. First, Tazewell asserts UVB's motivation to forestall Chapter 11 bankruptcy was shown in Bowman's notes and testimony regarding discussions with a UVB attorney. And, Tazewell asserts, "chapter 11 reorganization was necessarily impossible once the banks were successful in choking off all cash available to support further Tazewell operations."
Next, Tazewell points to the testimony of its two experts that there was no sound commercial reason for UVB to allow M & M to retain $186,000 in Tazewell receivables and that the banks used the "least effective" method for collecting accounts receivable, "notification financing." This approach, Tazewell argues, shows UVB's intent to destroy Tazewell rather than to "maximize its recovery."
A desire to destroy the company is also evident, Tazewell asserts, from the number of actions undertaken by UVB in "a cloak of secrecy" without the type of notice which normally would be afforded a debtor. Tazewell points to its expert witness testimony that UVB's November 30, 1984 letter did not constitute commercially reasonable notice to Tazewell of a default that would *619 support UVB's actions in May 1985. Freezing Tazewell's bank accounts and notifying its account debtors without notice to Tazewell effectively deprived Tazewell of the ability to protect its interests.
Next, Tazewell points to materially false statements made by UVB when filing its injunction action seeking court intervention. UVB's request to the court to hold the accounts receivable collections and to make proper division because of commingling or loss of funds was unnecessary because the banks' May 31 agreement had obviated the need for segregation of the accounts by the court. And finally, Tazewell contends that bank witnesses' testimony consisted of "inconsistent and incredible statements" which gave "graphic evidence of the guilty mind with which their conspiracy proceeded."
The court instructed the jury that it must return a verdict in favor of Tazewell if it found from clear and convincing evidence that:
(1) these banks acted in concert, agreed, associated or combined for the purpose of willfully and maliciously damaging Tazewell in its trade or business, and
(2) that the trade or business of Tazewell was damaged as a result of the banks' actions.[4]
Based on our review of the record, we cannot say that there was insufficient evidence, as a matter of law, to support a verdict for Tazewell on its conspiracy count. Factual findings of a jury confirmed by the trial judge will not be reversed on appeal unless there is no credible evidence to support them.
There is credible evidence to support a finding that UVB acted in concert with M & M and agreed, associated, or combined for the purpose of willfully and maliciously damaging Tazewell in its trade or business. The record shows that UVB intended to forestall a chapter 11 filing and that its actions exhibited a willful disregard for Tazewell's rights. UVB's protestations that it was "merely attempting to collect its debts" ring hollow in light of the extensive and unusual actions it undertook in concert with M & M to eliminate any ability of Tazewell to continue operating or to file a reorganization plan under chapter 11 by removing Tazewell's access to cash flow, inventory, or other financing.

C. CONSOLIDATION OF CASES
UVB argues that the trial court should not have consolidated all eight cases involving the three banks, McLaughlin, his corporations, and the accommodation parties because it was "unmanageable." Although some cases involved separate facts and claims, common facts arising out of the complicated relations between McLaughlin, his corporations, the accommodation parties, and the three banks over essentially the same period of time were integral to all cases.
Most of the cases required testimony from McLaughlin, Bowman, and Graham to establish the course of dealing among these parties. The trial testimony of these three witnesses took substantial parts of six days and extended over 1,349 pages of the record. Other witnesses also would have been required to relate many of the same facts in each case. Under these circumstances, we find no abuse of the trial judge's discretion in consolidating these cases. See Commonwealth v. Pembroke Limestone Works, 145 Va. 476, 487, 134 S.E. 717, 720 (1926).

D. ADMISSION AND EXCLUSION OF EXPERT WITNESS TESTIMONY
UVB complains of the admission and exclusion of expert witness testimony. The trial court permitted two expert witnesses to testify about the commercial unreasonableness of the May 31 agreement and the service of notice on Tazewell's account debtors. Additionally, they testified that M & M's May 8 letter and UVB's November 30 letter were not notices of *620 default according to reasonable commercial standards.
UVB contends that this testimony was irrelevant and inadmissible because it did not deal with the issues of conspiracy and M & M's breach of contract. We disagree. The lack of notice of default establishes that both banks breached their contracts with Tazewell. The lack of commercial reasonableness tends to illustrate the egregiousness of their conduct.
UVB also argues that this testimony "invaded the province of the jury." We assume UVB is contending that the testimony went to the ultimate issues in these cases. The opinions of these witnesses were useful to the jury in deciding the ultimate fact in issuewhether UVB conspired with M & M or tortiously induced M & M to breach its contract with Tazewell. See Compton v. Commonwealth, 219 Va. 716, 724, 250 S.E.2d 749, 754 (1979).
Next, UVB complains that the trial court refused to qualify William H. Daughtrey, one of its experts, as one familiar with "generally accepted commercial standards and practices in the lending industry." Daughtrey was qualified by the court as an expert on troubled businesses. However, because he had not been shown to be "familiar, generally, with acceptable commercial standards within the [banking] industry," the court declined to qualify him in that field.
Whether to qualify a witness as an expert rests largely within a trial court's discretion. And, the fact that a witness is an expert in one field does not make him an expert in another field, even though that field is closely related. VEPCO v. Lado, 220 Va. 997, 1005, 266 S.E.2d 431, 436 (1980). Accordingly, we find no abuse of the court's discretion in this regard.
Finally, although UVB's experts were permitted to testify extensively about the perilous financial condition of Tazewell, UVB argues that the court erred by refusing to permit its experts to testify that Tazewell was not a going concern at the time the banks seized its assets. The trial court did not err in refusing to allow witnesses for either Tazewell or UVB to address this issue as it went to the cause of Tazewell's destruction and, therefore, was conclusory. See Ramsey v. Commonwealth, 200 Va. 245, 251-52, 105 S.E.2d 155, 159-60 (1958).

E. JURY INSTRUCTIONS
UVB argues that the trial court erred in giving certain instructions and in refusing others. It is sufficient to state that we have considered UVB's arguments on this subject and have concluded that the trial court did not err in charging the jury.

F. ATTORNEY'S FEES AND COSTS
Code § 18.2-500(a) allows recovery for conspiracy of "the costs of suit, including a reasonable fee to plaintiff's counsel." The trial court awarded attorney's fees and costs against UVB in the sum of $472,000. Of this amount, $425,000 represented attorney's fees, expenses, and costs incurred during the trial, and $47,000 was for attorney's fees and costs incurred subsequent to the trial.
In support of its motions for costs and attorney's fees, Tazewell submitted to the trial court almost 300 pages of contemporaneous time records detailing the activities for which fees were sought. Tazewell also submitted affidavits of its attorneys upon the reasonableness of the hourly rates charged and the accuracy of the time billed. UVB presented nothing to contradict the affidavits. The trial court determined that the time spent in preparing Tazewell's case against UVB for conspiracy would have been substantially the same whether additional defendants had been involved and whether additional, factually intertwined but legally distinct counts had been brought.
UVB contends that the "award of costs and fees ... should be set aside because the motion and supplemental motion and support affidavits are insufficient as a matter of law and the award is excessive." We do not agree.
*621 Where, as here, a statute authorizes recovery of attorney's fees and expenses, the fact finder is required to determine from the evidence the amount of the reasonable fees under the facts and circumstances of each particular case. Mullins v. Richlands National Bank, 241 Va. 447, 449, 403 S.E.2d 334, 335 (1991). "In determining a reasonable fee, the fact finder should consider such circumstances as the time consumed, the effort expended, the nature of the services rendered, and other attending circumstances." Id. While expert testimony ordinarily is necessary to assist the fact finder, such testimony is not required in every case. See id. In this case, expert testimony was not necessary because of the affidavits and detailed time records, which were wholly unrefuted by any evidence offered by UVB. Accordingly, we hold that the amount fixed by the trial court was amply supported by the evidence and we find no error in the trial court's allowance.

G. POST-TRIAL DISCOVERY
UVB complains that the court should have permitted post-trial discovery of the bases of the Grundy and M & M settlements. According to UVB, it had a right to take such discovery on the "threshold requirement under Code § 8.01-35.1 that the release[s] be given in good faith."
UVB was furnished with a copy of the settlement agreements and received answers to post-trial interrogatories it filed regarding settlement negotiations. It has not indicated what additional evidence it expected to obtain in further discovery on the issue of good faith that it could not have obtained in a trial. Absent a showing of prejudice, under these circumstances, we find no abuse in the court's discretion to deny discovery. See Rakes v. Fulcher, 210 Va. 542, 546, 172 S.E.2d 751, 755 (1970).
This ruling, however, is without prejudice to UVB's right to further discovery upon remand of the settlement issues discussed later in this opinion.

II. TAZEWELL'S APPEAL, RECORD NO. 910299
In its appeal, Tazewell contends that the trial court erred in not entering judgment based on the full amount of compensatory and punitive damages contained in the jury's verdict, in fixing the prejudgment interest rate at 7%, and in reducing the award by the amount M & M and Grundy paid to others.

A. COMPENSATORY AND PUNITIVE DAMAGES
As we have stated, the jury found that UVB not only had conspired to injure Tazewell's business, but also had tortiously interfered with Tazewell's February 8 contract with M & M. The jury awarded compensatory damages of $300,000 on each of the conspiracy and tortious interference counts, and $300,000 punitive damages on the tortious interference count.
The trial court entered judgment on the conspiracy count, trebled the damages to $900,000, and reduced that award by the total of the settlement amounts. The trial court, although concluding that the evidence supported the verdicts on the two counts, refused to enter judgment on the tortious interference claim, concluding there was no evidence to support a combined verdict of $600,000 for compensatory damages. The trial court ruled that once "the jury concluded that the evidence justified a verdict in favor of Tazewell Oil on the conspiracy count, the tortious interference count was consumed," and to allow damages for that tort would result in a double recovery.
Contending that the trial court correctly ruled that the evidence was sufficient to support the jury's finding of UVB's liability for tortious interference, Tazewell argues that the trial court erred "by ignoring the jury's verdict and speculating that the jury meant to make only a single compensatory damage award to Tazewell in the amount of $300,000."
We will agree with Tazewell and assume without deciding that the evidence was sufficient to support a finding of liability against UVB for tortious interference. We *622 disagree with Tazewell, however, that the trial court erred in refusing to allow a double recovery. In setting damages of $300,000 on both the conspiracy count and the tortious interference count, the jury obviously relied on the testimony of James Wayne Childress who stated that McLaughlin had offered in May 1985 to sell Tazewell to him for $300,000. There was no evidence to permit the jury to distinguish between the damages caused by the conspiracy and the tortious interference because the claim, under both counts, was that Tazewell had been destroyed as a going concern. Given the discretion vested in the trial judge to supervise jury awards of damages, we cannot say that the trial court abused its discretion in limiting Tazewell's recovery in this case and in refusing to enter judgment for either compensatory or punitive damages on the tortious interference count.

B. LIMITATION OF INTEREST RATE
Tazewell argues that the court erred in confirming the post-judgment interest rate at seven percent, the rate fixed by the jury in a form verdict prepared by Tazewell. Tazewell contends that Code § 6.1-330.54, fixing the judgment rate of interest at rates higher than seven percent, mandates the application of that rate to post-judgment interest. We do not agree.
Tazewell reasons that Code "§ 8.01-382 allows the jury to fix the date from which interest will run, and § 6.1-330.54 mandates a rate of eight percent on any such award."[5] (Emphasis added.) We need not resolve this issue because the form verdict Tazewell tendered provided in part that the jury could "further award Tazewell Oil ____% interest on the sum of $____beginning on____, 198____ until paid." In this case, Tazewell invited the court to allow the jury to fix the rate of prejudgment and post-judgment interest, and it cannot now complain of the court's failure to modify the rate of interest fixed by the jury.

C. REDUCTION OF VERDICTS BY SETTLEMENT AMOUNTS
The trial court reduced Tazewell's recovery by $473,500, the full amount M & M and Grundy paid for the releases. Tazewell contends that the court erred in doing so because the settlements included claims of other parties against Grundy and M & M, as well as claims of Tazewell against those banks other than its claims for conspiracy and tortious interference.
Code § 8.01-35.1(A)(1) provides in pertinent part that:
any amount recovered against the other tortfeasors, or any one of them, shall be reduced by the amount stipulated in the covenant or release or, in the amount of the consideration paid for it, whichever is greater.
In this case, the only stipulation was in M & M's release, which provided that only $15,000 of the consideration paid was for Tazewell's claims for conspiracy damages.[6] The trial court reasoned, and UVB urges here, that the statute "makes no provision for allocating the consideration between causes of action, or tort feasors." As the entire amount of consideration paid for the releases in this case, $473,500, exceeds the stipulated amount, it operates as a credit against the subsequent recovery. We disagree.
In applying this provision of § 8.01-35.1, the trial court must identify the amount of consideration paid by a tortfeasor for a release. In determining this amount, the court must look at the injury or damage covered by the release and, if more than a single injury, allocate, if possible, the appropriate amount of compensation for each injury. The releases in this case involved multiple claims and multiple parties who *623 are closely associated.[7] Nevertheless, the record does not reveal any attempt by the trial court to ascertain whether the amounts paid were based on the single injury of destruction of Tazewell, or whether some of the consideration covered releases for a different injury or injuries suffered by Tazewell, or suffered by other parties. Without such evidence or analysis, the trial court could not determine whether the amount stipulated in the release to be credited against recovery was more or less than the amount actually paid in consideration of the release for the conspiracy claims. Consequently, we will remand the case for proceedings necessary to make the determinations required by Code § 8.01-35.1.

III. CONCLUSION
For the reasons assigned, we will affirm the judgment of the trial court awarding damages, attorney's fees, and costs on the conspiracy count; reverse the judgment insofar as it reduced the judgment by the full amounts of the sums paid in settlement; and remand the case for further proceedings consistent with this opinion.
Affirmed in part, reversed in part, and remanded.
WHITING, J., with whom STEPHENSON, J., and POFF, Senior Justice, join, dissenting in part and concurring in part.
WHITING, Justice, with whom STEPHENSON, Justice, and POFF, Senior Justice, join, dissenting in part and concurring in part.
I dissent from those parts of the opinion that sustain the judgment awarding damages, attorney's fees and costs on the conspiracy charge and denying a recovery on the tortious interference with contract claim. For the reasons set forth later, I would enter judgment confirming the jury's verdict for compensatory and punitive damages on Tazewell's tortious interference claim.
I concur in the result in the rulings upon instructions and the application of the settlement amounts to Tazewell's award but assign different reasons therefor.
I join the balance of the majority opinion.

I. CONSPIRACY CHARGE
The jury found that UVB's agreement to the liquidation of Tazewell's accounts receivable and inventory was in violation of Code § 18.2-499(a). I think that the standard to be applied to this issue was established in our holding in the recent case of Greenspan v. Osheroff, 232 Va. 388, 351 S.E.2d 28 (1986), a case relied upon by UVB and not discussed by the majority. Paraphrasing the language in Greenspan, which construed this statute, I would hold that if
the fact-finder is satisfied from the evidence that the defendant's primary and overriding purpose [was] to injure [Tazewell in its business], motivated by hatred, spite, or ill-will, the element of malice required by Code § 18.2-499 is established, notwithstanding any additional motives entertained by [UVB] to benefit [itself] or persons other than the victim.
Id. at 398-99, 351 S.E.2d at 35-36 (emphasis added.)
In Greenspan, the evidence was sufficient to show that a younger doctor's "primary and overriding purpose" was to injure the older doctor in his profession in order to acquire his patients. And, in this case, unless the evidence is insufficient as a matter of law to sustain a finding that UVB's "primary and overriding purpose" was to destroy Tazewell, and that this purpose was "motivated by hatred, spite, or ill-will," rather than a motive to effect an immediate collection of its debts, the judgment on this count should be affirmed. *624 However, I conclude that the evidence in this case is insufficient to prove malice.
Tazewell contends that
the evidence permitted the jury to conclude that the banks, increasing[ly] irritated in their dealings with Tazewell, had agreed to destroy Tazewell by shutting off the cash necessary for its continued operations in order to prevent Tazewell from exercising its legal right to seek the protection of chapter 11 of the United States Bankruptcy Code. The banks' intentional destruction of Tazewell to prevent a chapter 11 reorganization was in complete disregard of Tazewell's rights and was utterly without legal justification.
Tazewell claims that five aspects of the evidence suffice to infer a conspiracy to "destroy" Tazewell. In order and summarized, they are: (1) "the real motivation" of "forestall[ing] a chapter 11 filing;" (2) no legitimate purpose for UVB to subordinate its lien on Tazewell's accounts receivable to M & M; (3) action taken in secret without the required default notices in order to deprive Tazewell of the opportunity to protect its interests; (4) a materially false pretense that the Cardinal and Tazewell accounts receivable had been commingled, necessitating the injunctions sought when the banks' secret agreement obviated their segregation; and (5) "inconsistent and incredible statements" of bank witnesses giving "graphic evidence of the guilty mind with which their conspiracy proceeded." Additionally, Tazewell notes that UVB used a permissible, but what its experts testified was the "least effective" method of realizing upon its security"notification financing."
I consider this evidence sufficient to support a factual finding that the methods employed by UVB in its efforts to make an immediate collection of Tazewell's debts were indefensible and exhibited a willful disregard of Tazewell's rights. Indeed, as Tazewell contends, UVB's secret actions and inconsistent statements tend to show that UVB intended "to forestall a chapter 11 filing" because it realized that a filing under the Bankruptcy Act would have delayed its collection efforts. See 11 U.S.C. § 362.[1]
Although UVB used the methods described, and was willing to sacrifice the possibility of a maximum return at a future date for an immediate but smaller return, I cannot agree that such a purpose constitutes a "primary and overriding purpose" to destroy Tazewell, one motivated by "hatred, spite, or ill-will." Unlike Greenspan, where the evidence showed that it was necessary that the younger doctor injure the older doctor's business in order to acquire it for himself, nothing in this record supports an inference that UVB had to destroy Tazewell in order to collect its debt, or that UVB's employees were motivated by any element of malice. UVB's conduct shows only that its "primary and overriding purpose" was to effect an immediate collection of Tazewell's indebtedness, not to destroy the debtor. It is true, as the majority says, that the jury instruction using the language of the conspiracy statute is "the law of this case." But that language as construed and applied in Greenspan requires proof of a "primary and overriding purpose ... motivated by hatred, spite, or ill-will."
Thus, viewing the evidence in the light most favorable to Tazewell, I would hold that the evidence is insufficient, as a matter of law, to support a finding of "the element of malice required by Code § 18.2-499." Greenspan, 232 Va. at 399, 351 S.E.2d at 35-36. Accordingly, I would reverse that part of the judgment of the trial court awarding damages on the conspiracy claim.
Because any award of attorney's fees in Tazewell's case against UVB is dependent upon UVB's violation of the conspiracy statute, I would also reverse that part of the judgment of the trial court that awards attorney's fees and costs to Tazewell.

*625 II. TORTIOUS INTERFERENCE WITH CONTRACT

A. Compensatory Damages

The trial court provided in its judgment that if the "conspiracy count be overturned for any reason," Tazewell would be entitled to recover the $600,000 compensatory and punitive damage award for UVB's tortious interference with its contract with M & M. Accordingly, I would consider the merits of this claim as well.
The necessary elements of the cause of action for tortious interference with contract (tortious interference) are noted as:
(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.
Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985) (citation omitted).
I look first at that part of the contract underlying Tazewell's claim of tortious interference. Paragraph (9) of the February 8 agreement provides that if Cardinal "violate[s] any of the terms of this agreement, the Cardinal Fuels Inc. debt will become due and payable in full, if the company remains in default 15 days after written notification."
According to UVB, the evidence is deficient in several respects. First, it fails to show UVB's knowledge of M & M's February 8 contract. However, Mr. Street, the attorney for both M & M and UVB at the time the May 31 agreement was performed, was aware of all of the terms of the February 8 agreement. Unlike Bostic v. Amoco Oil Co., 553 F.2d 329, 335 (4th Cir.1977), cited by UVB, in which the attorney was "primarily" the adverse party's attorney and notice to him was not imputed to one who paid the attorney, both banks employed Mr. Street for a common purpose. Because the execution of the May 31 agreement was dependent upon the February 8 agreement, I conclude that this knowledge was imputed to UVB when Mr. Street became its attorney in its performance. Lebowitz v. McPike, 157 Conn. 235, 242-43, 253 A.2d 1, 5 (1968); Farr v. Newman, 14 N.Y.2d 183, 187, 199 N.E.2d 369, 371, 250 N.Y.S.2d 272, 275 (1964).
Additionally, Bowman's pencilled notations of his extensive conversations with Graham, as well as the other information he acquired before May 30, suffice to allow one to infer that he knew Cardinal had a contract for deferred payments to M & M and that the payments might be current. This knowledge imposed a duty on Bowman to make further inquiry as to the terms of the February 8 agreement. Galleria Towers, Inc. v. Crump, Warren and Sommer, Inc., 1991 WL 282154*4 (No. 90CA2044 Colo.Ct.App.) (opinion rendered Nov. 7, 1991). Had Bowman done so, he would have discovered the notice requirement in the agreement.
Hence, I consider the evidence sufficient to support the jury's finding that Bowman knew, or should have known, of the notice provision of M & M's contract with McLaughlin.
Next, UVB asserts that it cannot be liable because M & M did not breach its February 8 contract with Tazewell. UVB reads the requirement-of-notice provision as limited to M & M's right to accelerate payment of Tazewell's debt and not affecting M & M's right to seize the collateral prior to acceleration. However, the notice provision can also be read as providing that there could be no seizure of the collateral until the debt is due and payable in full.
Nevertheless, UVB argues that, because this provision was written by McLaughlin, it should be construed against him. However, if contractual terms are ambiguous, "the construction placed upon a contract by the parties will be accepted by the court." Blair, Inc. v. Norfolk Redev. and Housing Auth., 200 Va. 815, 819, 108 S.E.2d 259, 262 (1959) (quoting Camp v. Wilson, 97 Va. 265, 269, 33 S.E. 591, 592 (1899)).
Graham thought M & M had to give notice, as evidenced by a letter he wrote McLaughlin on May 8. Additionally, Graham told Bowman during their discussions *626 leading up to the decision to seize the collateral that he had given Cardinal notice of default. And, when Graham told McLaughlin that M & M was "moving on" the accounts receivable and McLaughlin protested that he had not been given notice, Graham did not reply that notice was not required. Yet, at trial, Graham claimed that his May 8 letter to McLaughlin was a notice of default. Accordingly, I would adopt the parties' pretrial construction of the February 8 contract as requiring M & M to give Tazewell notice before it could seize Tazewell's accounts receivable.
Even if M & M had to give notice, UVB contends that Graham's letter of May 8, complaining of McLaughlin's failure to furnish the equipment lists and appraisals, was a notice of a default. However, that letter did not expressly declare a default, and the jury decided that its ambiguous terms did not constitute a notice of default.
Accordingly, I would hold that the evidence was sufficient to create a factual issue on the question whether M & M breached the notice provisions of the contract in its seizure of Tazewell's collateral.
Even so, UVB contends that it did not induce the breach, that M & M would have "moved on" Tazewell's accounts receivable without UVB's participation. I would reject this contention out of hand. The jury was justified in believing Graham's testimony on cross-examination that he told Bowman M & M "had no idea of moving to try to protect [its] interest unless there was an agreement that could be reached between [M & M and UVB]."
Finally, UVB maintains that its actions were privileged because it had a right to subordinate its interest to M & M's lien.[2] The issue, however, is not one of subordination but whether M & M had a right to seize this collateral without notice. On disputed facts, the jury found that M & M did not have such a right and, therefore, UVB had no right to induce M & M to breach its contract with Tazewell. Lacking such a right, UVB's actions were not privileged.
For all these reasons, I would conclude that the evidence was sufficient to support the jury's finding and the court's conclusion that UVB had tortiously interfered with Tazewell's contract with M & M. Accordingly, I would enter final judgment on the jury's verdict for compensatory damages.

B. Punitive Damages

UVB contends that the evidence does not support a punitive damage award for two reasons.
First, UVB insists that it had the "legal right" to enter into the agreement. As I have explained, UVB had no "legal right" to enter into the agreement.
Second, UVB contends that M & M's malice in breaching its February 8 agreement with Tazewell cannot be imputed to UVB. However, the issue is not one of imputation, but whether UVB acted with a willful and wanton disregard of Tazewell's rights in contracting with M & M for its seizure of Tazewell's accounts receivable.
And, as I pointed out earlier, the evidence supports a finding that UVB's indefensible methods of collecting its debt exhibited a willful disregard of Tazewell's rights. Therefore, I would conclude that there was sufficient evidence to justify an award of punitive damages for tortious interference against UVB and would enter final judgment on the jury's verdict for punitive damages.

III. INSTRUCTIONS

A. Instructions Granted

I agree with the majority that the trial court did not err in granting and refusing certain instructions. However, I would tell UVB why the court "concluded that the trial court did not err in charging the jury."
UVB contends that the court should have expressly included the requirement of a finding by the greater weight of the evidence in Tazewell's finding instruction on *627 tortious interference.[3] However, I believe that the trial court noted correctly that this burden of proof was covered in the general burden of proof instruction.
Next, UVB argues that two instructions to the effect that M & M could not take possession of the collateral without giving written notice of default were erroneous in failing to take into account "M & M's independent right of possession in the event of default." As noted earlier, the contract could be construed as requiring written notice of default before the collateral was seized. Hence, I would hold that the challenged instructions were not erroneous.
Finally, UVB contends that two instructions erroneously imputed to it the knowledge of its attorney. As has been pointed out, ordinarily a client is bound by his attorney's knowledge. And, I find no valid reason why UVB should not be bound by Mr. Street's knowledge.

B. Instructions Refused

UVB complains that the court refused to instruct the jury that Tazewell had to prove UVB's actual knowledge of the M & M-Tazewell contract before recovering for its tortious interference. This instruction was properly refused because, as was said earlier, constructive knowledge of a contract may give rise to a claim for its tortious interference.
UVB alleges that the court erred in refusing to instruct the jury that if Tazewell was not a going concern when its assets were seized, then M & M did not violate generally accepted commercial standards in causing the assets to be seized. As the trial court observed, this was a matter for argument and I do not think that it needed to be covered in an instruction.
UVB complains of the trial court's failure to grant two of its instructions dealing with Tazewell's burden to prove that UVB's actions caused M & M's breach of the contract. Both instructions included language that UVB's actions must have contributed in a "material and substantive" way to that breach. These instructions were argumentative and Tazewell's burden was stated correctly in other instructions. Hence, I would hold that the instructions were properly refused.
Finally, UVB argues that the court erred in refusing an instruction that an interference with a contract was not wrongful if undertaken in the exercise of a legal interest or right. I conclude that this instruction was properly refused because the issue was covered in another instruction.

IV. REDUCTION OF VERDICTS BY SETTLEMENT AMOUNTS
The court reduced the awards by the full amounts recited as payment for the releases. Tazewell contends that the court erred in doing so because the settlements included claims of other parties against Grundy and M & M, as well as Tazewell's claims against those banks other than those for conspiracy and tortious interference. However, at the post-trial hearing on this issue, Tazewell introduced no evidence of the respective amounts paid to each of the multiple parties who released various claims, or of the value of its conspiracy and tortious interference claims against M & M and Grundy. On the other hand, apart from introducing the releases, UVB introduced no evidence to support its contention that the remaining claims of Tazewell, its related corporations, or the accommodation parties were for injuries indivisible from those inflicted by the alleged conspiracy and tortious interference.
As noted earlier, Code § 8.01-35.1 provides that any sums received in settlement from other "persons liable in tort for the same injury [or] property damage.... shall be considered by the court in determining the amount for which judgment shall be entered." (Emphasis added.) In order to make that determination, the court must decide whether the claim settled is the "same injury [or] property damage." *628 If it is, the court then determines "whichever is the greater" of "the amount stipulated by the covenant or the release, or ... the amount of the consideration paid for [the covenant or release]."
But where claims are only partly settled, other factors must be considered by the court in making the determination required by Code § 8.01-35.1. In these unusual settlements, involving multiple claims of multiple parties who are closely associated, the trial court was also confronted with the necessity of determining the nature and value of those claims in order to decide whether the settlement of those claims and the value of the remaining claims of those parties affect "the amount of the consideration paid for [the release of the claims under consideration]." Code § 8.01-35.1 (emphasis added).
To make that determination, the trial court should have had evidence of the nature and value of: (1) the liabilities that could be asserted in relation to the facts giving rise to the claims released, as well as of any related claims not released; and (2) the injuries and damages that could be claimed by (a) the parties who joined in the releases and covenants not to sue, and (b) those parties having a close relationship with the releasors.
Hence, I review the record to ascertain whether it contains sufficient information for the trial court to decide whether all or any part of the "consideration paid" for the releases should be considered "in determining the amount for which judgment shall be entered."
Tazewell, McLaughlin, Sylvia O. McLaughlin, William W. McLaughlin, and Carroll G. Mays, Southside, and a number of its affiliates, including Cardinal, settled with Grundy. Tazewell, Cardinal, Southside, and McLaughlin "[i]ndividually, in their own stead and on behalf of their mutual and respective parent, subsidiary and affiliated corporations and all partnerships and joint ventures in which they have an interest," settled with M & M.
I will consider claims of Tazewell, the accommodation parties, and McLaughlin's corporations in that order.

A. Tazewell's Claims

Tazewell's claims are reflected in the following summary of the counts in Tazewell's motion for judgment against UVB, M & M, and Grundy:
Count 1M & M's breach of its agreement by seizing Tazewell's accounts receivable and checking accounts.
Count 2M & M's breach of fiduciary duty in perfecting its lien on Tazewell's accounts receivable before its demand notes had been converted into installment notes as provided in the February 8 agreement.
Count 3M & M's tortious interference with Tazewell's checking account contract with Grundy.
Count 4M & M's conversion of Tazewell's property by exercising dominion over Tazewell's checking account in Grundy.
Count 5M & M's conspiracy with UVB and Grundy to seize Tazewell's assets.
Count 6UVB's tortious interference with M & M's contract with Tazewell.
Count 7UVB's conspiracy with M & M and Grundy to injure Tazewell's business.
Count 8Grundy's breach of contract with Tazewell in dishonoring its checks after receiving the other two banks' notices not to honor Tazewell checks.
Count 9Grundy's wrongful dishonor of checks giving rise to common-law claim.
Count 10Grundy's wrongful dishonor of checks giving rise to statutory claim.
Count 11Grundy's conspiracy with other two banks.
Count 12Grundy's breach of contract in placing holds on Tazewell's accounts.
At trial, Tazewell claimed that M & M's acts of conspiracy and tortious interference resulted in the destruction of Tazewell as a business. Tazewell claimed that UVB was a co-conspirator with Grundy and M & M in Tazewell's destruction. Hence, Tazewell's conspiracy claim against Grundy and M & M as co-conspirators with UVB is clearly included in the settlement, and the proportionate "consideration paid" to settle those *629 claims should be determined and deducted from the award.
Tazewell, however, had other claims against Grundy and M & M that were not considered in the trial of the case. Paraphrasing the language in Shortt v. Hudson Supply, Etc., Co., 191 Va. 306, 310, 60 S.E.2d 900, 902-903 (1950), I think that the extent to which the amounts paid in the settlement of those other claims by Grundy and M & M to Tazewell were a part of "but a single claim,an indivisible cause of action for damages for [its destruction] arising out of [the seizure of its assets and that] ... it is immaterial whether those guilty of the wrongdoing were, strictly speaking, joint tort-feasors."[4]
On rehearing, to the extent that the evidence indicates that Tazewell's injuries or damages resulting from the conduct of Grundy or M & M is indivisible from injuries and damages resulting in Tazewell's destruction, I think that the proportionate amounts of "consideration paid" for the prior settlements should be deducted from the jury award. On the other hand, if the evidence indicates that such injuries and damages are divisible from those of Tazewell's destruction, I do not think that the portion of the settlement award paid for those injuries and damages should be deducted from the present jury award. However, if some of the settled claims are indivisible and others are divisible, I believe that the trial court must determine the proportion of the "consideration paid" for the release that should be deemed to relate to the indivisible claims, and should deduct only that portion of the "consideration paid" from the jury award.

B. Other Parties' Claims

I agree with Tazewell that the settlement of other parties' claims unrelated to Tazewell's judgment against UVB cannot be credited against its judgment against UVB. See Katzenberger v. Bryan, 206 Va. 78, 86, 141 S.E.2d 671, 676-77 (1965). However, I think that a trial court should consider: (1) whether these injuries are indivisible from the injuries inflicted upon Tazewell by the conspiracy and tortious interference; and (2) the nature and extent of those claims in order to determine the proportion of the "consideration paid" that is properly attributable to those claims.
McLaughlin, Sylvia McLaughlin, William W. McLaughlin, and Carroll G. Mays, accommodation parties, filed separate actions against the three banks. Generally, they alleged that their guarantees or properties had been used as part of the security for a Southside loan, that Southside had guaranteed Tazewell's indebtedness to UVB, and that the banks' conduct had prejudiced their rights. Their allegations of wrongdoing generally paralleled those Tazewell made against the banks. I conclude that the value of their claims of damage to their separate property and interests should not have been deducted from Tazewell's award.
The Grundy settlements involved causes of action against it for its activities relating to Tazewell's checking accounts from 1982 to 1985. Generally, those causes of action arose out of Grundy's failure to honor Tazewell's checks after being served with notice by the other two banks. Obviously, these parties' claims arise out of the activity of a party other than UVB that may have inflicted an injury separate and apart from the destruction of Tazewell. To that extent, that portion of the "consideration paid" for those releases should not have been deducted from Tazewell's award.
Cardinal's claims against UVB, reflected in an action filed against UVB, contain a number of charges similar to those made by Tazewell. Other McLaughlin corporations *630 joined in the releases, but the nature of their claims is not disclosed.
I find nothing in the record that would have assisted the trial judge: (1) in ascertaining the nature of the claims of McLaughlin's corporations other than Tazewell and Cardinal; (2) in fixing the value of the third parties' claims; or (3) in determining the proportion of the "consideration paid" that is attributable to those third parties' claims.
Accordingly, I would remand this case for proceedings necessary to make the determinations required by Code § 8.01-35.1.
NOTES
[1] United Virginia Bank later changed its name to Crestar Bank.
[2] Because of an error in one of its instructions, the court set aside the verdict for Tazewell in UVB's claim against it. It set the case for trial on limited issues at a later date.
[3] We will consider the tortious interference issue when we discuss Tazewell's appeal, infra.
[4] UVB assigned error to this jury instruction but did not present argument on this assignment on brief and, therefore, we do not consider it. St. Joseph's Soc. v. Va. Trust Co., 175 Va. 503, 9 S.E.2d 304 1940.
[5] The judgment rate of interest was increased to nine percent in a 1991 amendment to Code § 6.1-330.54. Acts 1991, c. 508.
[6] The trial court had struck Tazewell's claims against Grundy for conspiracy and punitive damages prior to the settlement with Grundy. Consequently, the settlement states that none of the proceeds were being paid for release of the conspiracy claims against Grundy. "All such claims have been asserted in pending litigation and will be dismissed with prejudice on the merits."
[7] As previously discussed, a single document may include releases for both contract and tort claims. See infra Part I.A.
[1] It should be noted, however, that had Tazewell sought chapter 11 protection, this would not have permitted it to continue to deal with its accounts receivable and money on deposit as if it were its own property. UVB, as Tazewell's secured creditor, should have compelled Tazewell to post security equal to the value of its lien upon those assets. 11 U.S.C. §§ 361, 362(g)(2).
[2] Even if such a subordination right existed, without objection, expert witnesses testified that UVB may not have had the right of immediate possession of its security because of the lapse of time and its dealings with McLaughlin after giving the notice.
[3] Although the instruction omitted Tazewell's burden to prove the claim of tortious interference, the instruction stated that UVB had the burden of proving justification" by a preponderance of the evidence." This error was not called to the trial court's attention and I would not notice it here. Rule 5:25.
[4] The trial court heard the evidence in these cases extending over a period of five weeks. It heard argument and took evidence on various phases of all of the cases on 19 other occasions. In one of the post-trial arguments, the trial court `observed:

I want somebody to explain to this court how this court can take this conspiracy count with all of these other pleadings that have been filed and separate those other separate actions from this conspiracy....
You gentlemen know ... it's so intertwined, all of thisI still believe [that] if you gentlemen knew you could have gotten a verdict in the conspiracy case I don't believe any of these other lawsuits would have been around here.