## CIRCUIT COURT OF FAIRFAX COUNTY

Gail Stepp et al.

v.

James A. Foster et al.

November 23, 1998

Case No. (Chancery) 146295

BY JUDGE KATHLEEN H. MACKAY

The issue addressed in this opinion letter is to what extent the Plaintiffs are liable to the Defendants for the payment of their attorney's fees and costs incurred in this litigation. The Court must consider the reasonableness of Defendants' fees having already decided in its letter opinion of June 5, 1998, that Plaintiffs in theory are liable for these fees█ With minor exceptions, the Court finds that Defendants' fees are reasonable for the reasons set out below.

### Background

The Plaintiffs in this case are Gail and Marie Stepp and Ralph and Patricia Edwards as individuals; Gail Stepp as a trustee; and Ralph Edwards as a representative of the Belmont Bay Community Associates (Associates). The Defendants are James A. Foster and Marvin E. Lear, individually; James A. Foster and Marvin E. Lear as trustees and Carol Ann Wright as a putative trustee; the Belmont Bay Community Association, Inc. (BBCAI); and the following as beneficiaries of the Belmont Park Estates Trust Agreement: Michael Polifko, William B. Foulois, Thomas G. Goeller, George E. and Nancy L. Arnold, Fritz Vandenberg, as well as other individuals and organizations listed in Exhibit E to the Bill of Complaint.

At issue in this community dispute is the interpretation of a Deed dated February 24, 1973, whereby certain property in the Belmont Park Estates

Subdivision was transferred to James A. Foster, Marvin E. Lear, and Marshall L. Ware as trustees for the use and benefit of all lot owners in the Subdivision. The parcel was composed primarily of a lake and beach. The litigation arose over conflicting interpretations as to the duties and responsibilities of the trustees and their relationship to lot owners in the Subdivision as well as to the two rival homeowner associations, Associates and BBCAI.

The Bill of Complaint asked for relief in three counts: Count I sought declaratory relief on a number of issues, including the manner in which trustees could act, the relationship between the trustees and the BBCAI, whether the BBCAI had the power to collect assessments on lot owners, and who were the properly appointed trustees; Count II asked the Court to order an accounting for all monies collected by Defendants Lear and Foster from 1994 on and to hold the Defendants accountable for any funds which were spent for unauthorized purposes or were unaccounted for; Count III asked the Court to remove Defendants Lear and Foster as trustees and asked that damages be assessed against them for breach of their fiduciary duties.

The Bill of Complaint was filed on October 3, 1996, and the case was tried on February 23, 1998. The Court rendered its decision on March 4, 1998, finding no merit in Plaintiffs' claim that Defendants had breached their fiduciary duties. The Court agreed with Defendants' theory as to the legal relationship between the trustees and lot owners. At the close of the trial, the Defendants asked for their fees and costs.

The Court took this issue under advisement and issued an opinion letter on June 5, 1998, having reviewed briefs submitted by counsel. At Plaintiffs' request, the Court held a hearing on the reasonableness of fees on August 12, 1998.

### Legal Standard

The Virginia Supreme Court has opined that:

> In determining a reasonable fee, the fact finder should consider such circumstances as the time consumed, the effort expended, the nature of the services rendered, and other attending circumstances. Ordinarily, expert testimony will be required to assist the fact finder.

*Mullins v. Richlands Nat'l Bank,* 241 Va. 447, 449 (1991); see also *Tazewell Oil Co. v. United Va. Bank,* 243 Va. 94, 113 (1992).

The United States Court of Appeals for the Fourth Circuit has set out twelve factors relevant to a determination of attorney's fees. While the parties

did not present evidence on every one of these factors, considerable evidence was presented as to the following factors which are similar to the general considerations set out in *Mullins*: time and labor expended; novelty and difficulty of the questions raised; skill required to properly perform the legal services rendered; the customary fee for like work; the amount in controversy and the results obtained; the experience, reputation, and ability of the attorney; and attorney's fees awarded in similar cases. *Barber v. Kimbrell's, Inc*, 577 F.2d 216, 226 (4th Cir. 1978).

In the following analysis, the Court has considered all of these factors but has organized its discussion under more general headings.

### Nature of the Case

The Court has summarized the nature of the relief sought by the Plaintiffs. The Bill of Complaint makes specific allegations against James A. Foster. For instance, in Paragraph 7, the pleading alleges that Foster was the author of a plan to exclude Gail Stepp from functioning as a trustee:

so that certain personal objectives of James A. Foster could be advanced without interference ... . These objectives included the development and enforcement of roads in the subdivision and the establishment of a formal homeowner's association to govern the subdivision, all of which would be to the primary use and advantage of James A. Foster and/or his partnerships who own at least 38 lots in the subdivision which he desired to develop and sell.

Paragraphs 17 through 19 elaborate on this thesis. Paragraphs 20 and 21 allege that the new Association (BBCAI) received funds properly belonging to an older organization, the Belmont Bay Community Associates (Associates). The Bill of Complaint alleges that BBCAI collected funds from lot owners under false pretenses.

In order for the Defendants to defend themselves from these accusations, the Defendants were obliged to put on as evidence the entire history of this community from 1973 to the present. Present day practices could only be explained with reference to past practices. The somewhat haphazard records of a volunteer association had to be collected and analyzed and digested so that a theory could be constructed that was coherent and presentable to the Court. This in itself was an extremely tall order.

Both Plaintiffs and Defendants were called upon to explain how the community was established, the origination of the trust document, how the

original and successor trustees were selected, how lot owners were notified of community meetings, how the rival associations were formed, how funds were collected, how these funds were spent, and who benefitted from expenditures.

From 1994 on, both sides had to show literally who said what to whom in order to illustrate either the presence or absence of the alleged conspiracy. We are talking about a community of homeowners. We are not talking about a sophisticated entity that was experienced in record keeping. To accumulate the evidence necessary to put on a case, both sides had to conduct extensive discovery. They had to rely on narratives from the members of the community. The depositions in this case were in fact a sort of oral history of the Belmont Park Estates Subdivision.

It is not an exaggeration to say that when Plaintiffs filed this lawsuit, they ignited a firestorm. The Court heard testimony from seventeen members of the community and four expert witnesses, including the lawyer who drafted the 1973 trust document.[2] By the Court's rough estimate, it appears that some twenty families were represented in the courtroom every day of the trial.

The trial itself lasted six and one-half days. Plaintiffs' exhibit book consisted of some eighty-two exhibits. Each exhibit contained many pages, and the Court estimates the total exhibit book to be over a thousand pages. The Defendants' exhibit book was only slightly less bulky and consisted in the main of every official record or piece of correspondence which had ever been drafted or sent or received by BBCAI or its predecessor from 1972 to October 1997. Defendants even presented a brochure advertising the development dated 1961. (The lake figured prominently.)

The Court's file reflects the contested nature of this litigation. The Court's ledger reflects thirty-three separate entries for pleadings filed or orders entered prior to trial. Three Demurrers were filed by the Defendant trustees as well as one Motion for Partial Summary Judgment. Defendants were victorious as to their first Demurrer and won their Motion for Summary Judgment.[3]

The legal issue in the case, that is, the interpretation of an ambiguous trust document, although challenging, was not nearly so daunting as was the compilation of the historical record. Even though both sides had to struggle with this task in order to make their case, Attorney Clary's fees were substantially larger than Attorney Annino's.

---

[2] These numbers are taken from the Court's own notes rather than from an actual transcript.

[3] *See* Judge McWeeny's Order of January 17, 1997, and Judge Roush's Order of April 11, 1997. Plaintiffs had some success in their own Partial Motion for Summary Judgment. *See* Judge Roush's Order of January 30, 1998.

At this point, it is important to note that Defendants won the case. It was clear to the Court that Clary had mastered his material. He was extremely effective. It is reasonable to assume that the extra time he spent on the case yielded the result he obtained.

## Nature of the Representation

Attorney Clary and Attorney Moore of the firm Clary and Moore represented the Defendants. Clary is asking the court to award his clients his fees and costs through trial and his fees and costs post trial. Through trial, the fees of Clary and Moore were $138,506.00 and the costs were $9,529.21.[4] Clary billed at $225.00 an hour and Moore at $175.00. Clary was lead counsel in the case and alone represented his clients at trial. He represented all the named trustees and individuals. He submitted his fees and expenses through trial by means of a three-page affidavit and a thirty-seven page billing statement dating from August 8, 1996, through March 6, 1998. It appears from his billing statement that Clary wrote off some 15.5 hours of his time as "no charge" and some 72.5 hours of paralegal time as "no charge."

At the August 12th hearing, the Plaintiffs put on an expert, Susan Pesner, Esq., to opine that Clary's fees were not reasonable. She stated that Clary and Moore performed tasks that a research associate or paralegal could have performed more cheaply. She opined that if the Defendants had used an attorney that had been offered through Mr. Foster's insurance carrier, economies on research time could have been realized. She compared this case to that of *Bruce v. Bruce*, Circuit Court of Fairfax, Chancery No. 149624, where the fees to represent the Defendant were lower. She opined that the fees should have been in the range of $80,000.00, including all post-trial work.

The Defendants put on an expert to justify their fees. Charles Molster, Esq., testified that the hourly rates charged by Clary and Moore were reasonable, that the type of work done by Defendants' attorneys bore a reasonable relationship to the fees charged, that the litigation itself was complex, and that the favorable result for the Defendants was testimony to the fact that the litigation was efficiently and effectively conducted. He regarded the charges made by the Plaintiffs against Defendants Foster and Lear to be akin to a "thinly-veiled fraud claim."

---

[4] Defendants were represented by the firm of Clary and Moore through April 30, 1998, and by Holland and Knight from May 1, 1998, both Messrs. Clary and Moore having joined the Holland and Knight firm.

It is this Court's opinion that the pre-trial and trial fees and costs were reasonable. In support of this finding, the Court notes that the seriousness of the charges merited the expenditure of time and money by the Defendants. Had the trustees lost their case, they would have been accountable for such monetary relief as the Court determined for breach of their duties "taking into account any loss or depression to the value of the Trust Estate resulting from self-dealing, any profit made by the Defendant through self-dealing, or any property that would have accrued to the estate if there had been no self-dealing." (Bill of Complaint, Count III).[5] It goes without saying that the affairs of the community would have been in great turmoil had Plaintiffs prevailed.

The Court finds that given the fact that Clary and Moore was a two-man firm that they managed their time wisely. They donated a significant amount of their time at the beginning of the litigation to their clients, and they appropriately used paralegal time to prepare exhibits for trial.[6] Mr. Clary's rate of $225.00 an hour was reasonable. If anything, it is low compared to other attorneys of his experience practicing in Fairfax. Mr. Moore's rate was also reasonable given his experience.

The Court is not convinced that had Defendants used a lawyer from an insurance defense firm that economies would have resulted. This case was unique. Success depended a great deal upon a mastery of the facts of the case, the history of the community, and an understanding of the characters and interpersonal relationships involved. This was not a situation where pulling case law out of a common file or off a computer would save a great deal of time.

Finally, this case bears no resemblance to the *Bruce* case. Coincidentally, this judge presided over that trial. That case was tried in two days, and although fact specific, involved just two brothers and their relationship to their father. In contrast, the case at hand had many parties, all of whom contributed to setting forth the twenty-five year history of Belmont Park Estates. Defendant

---

[5] In their Supplemental Answers to Interrogatories, Plaintiffs stated that they expected their expert, Ralph Spadaccini, to opine as to damages in the amount of $131,578.25. In addition, they asked for attorney's fees paid to Annino and to Ed Tolchin, representing BBCAI. (Supplemental Answers were submitted to Court by Clary on August 14, 1998.)

[6] By letter of March 14, 1997, Clary wrote Annino setting out his understanding of the *Willson v. Whitehead* case whereby unsuccessful plaintiffs suing defendant trustees could be liable for defendants' attorney's fees. 181 Va. 960 (1943). It was prior to that date that Mr. Clary donated a significant amount of time. After that date, litigation went forward in earnest. The letter of March 14th was attached to Clary's brief in support of an award of attorney's fees.

attorneys in *Bruce* accumulated fees in the amount of $71,000.00. If anything, that fee justifies a larger fee in *Stepp* given the greater complexity of the case.

The Court would make two minor adjustments and that is to deduct from the fees the amount of $1,000.00 as the price of the protective order obtained by the Plaintiffs on October 31, 1997, and the cost of an expert witness, Pia Trigiani, who was called by BBCAI rather than Defendant trustees.[7] The fee paid to the expert witness was $875.00.

## Insurance

Defendant Foster is an insured under a Personal Umbrella homeowners insurance policy issued by Nationwide Insurance. The policy potentially covered him for the costs of defending a lawsuit based upon alleged acts of negligence but not for intentional conduct. A copy of the policy is attached as an Exhibit to Defendants' Motion in Limine presented at the August 12th hearing. Nationwide's Reservation of Rights letter of December 13, 1996, was Plaintiffs' Exhibit A-1 at the August hearing.

At that hearing, Defendants sought to exclude any evidence of Mr. Foster's insurance coverage. The Court denied this motion and accepted a proffer from Annino that Nationwide had reimbursed Foster some $40,000.00 to cover his legal fees. Annino asked the Court to enter an order with regard to fees that would reduce any fees owed by the Plaintiffs by the amount paid by the insurance company to Foster.

With regard to the insurance question generally, Foster had the right to select an attorney other than the one offered by Nationwide. The charges leveled against Foster were serious. The December Reservation of Rights letter while legally proper and correct may have given rise to skepticism on Foster's part as to the enthusiasm with which he would be represented. The letter stated, "As such, while Nationwide will provide you with a defense in this case, this Company will deny payment of any judgment that may be obtained against you resulting from this incident and the allegations contained within this Bill of Complaint." *See* letter, page 1.

With regard to the requested setoff, Mr. Foster is only one defendant of many. All of the Defendants are liable to pay for Clary's fees and costs. A payment to Foster personally should not benefit all of the Defendants jointly. Furthermore, pursuant to the collateral source rule, compensation recovered by a tort victim may not be applied as a credit against the amount of damages the tortfeasor owes. *Shickling v. Aspinall*, 235 Va. 472 (1988); *Walthew v. Davis*,

---

[7] The Court is requiring BBCAI to bear its own fees and costs.

201 Va. 557 (1960); *Burks v. Webb*, 199 Va. 296 (1957); *Johnson v. Kellam*, 162 Va. 757 (1934).

Finally, it is highly unlikely that Mr. Foster will benefit from any windfall. Article 8 under "Exclusions" in Foster's policy clearly gives the insurance company the right of subrogation. The policy in plain English states: "When we pay, an insured's rights of recovery from anyone else becomes ours up to the amount we paid."[8] For all these reasons, the Court deems Foster's insurance to be irrelevant to the Court's ultimate determination as to fees and costs owed by the Plaintiffs.

### Post Trial Fees and Costs

In addition to reimbursement for their fees and costs to defend the case at trial, the Defendants are asking the Court to award them their fees and costs spent to defend their fees through August 12, 1998. The Plaintiffs contest this claim and ask that each party bear their own costs on this issue pursuant to the American Rule.

As the Defendants note in their brief, there is scant Virginia law on the issue of the award to a party of attorney's fees and expenses incurred in litigating the reasonableness of previously-incurred fees and expenses to which the Court has determined that party is entitled. Defendants cite two circuit court decisions that discuss analogous situations and cite a number of cases from other states and from a federal court that deal directly with the issue. *See Fresh Meadows Med. Assoc. v. Liberty Mut. Ins. Co.*, 49 N.Y.2d 93 (1979); *Prandini v. National Tea Co.*, 585 F.2d 47 (3d Cir. 1978); *Guinn v. Dotson*, 28 Cal. Rptr. 2d 409; and *Gagne v. Maher*, 594 F.2d 336 (2d Cir. 1979).

Plaintiffs argue that no fees are warranted because Defendants represented that they were not seeking post-trial fees when they filed their billing statements immediately after trial. Plaintiffs also argue for the Court's imposition of the American Rule since Defendants are making an "affirmative claim" by seeking fees. Plaintiffs allege that the Defendants are no longer in the defensive position contemplated by *Willson v. Whitehead*, 181 Va. 960 (1943).

It appears to this Court that to find that Defendants are owed fees and then to require them to bear their own fees to defend their fees flies in the face of common sense as well as legal sense. The Court in *Guinn v. Dotson* recognized this problem when it stated: "Where a doctrine supports the award of reasonable attorney's fees, it will often be frustrated, sometimes nullified,

---

[8] Foster's insurance policy was attached to Defendants' Motion in Limine.

if awards are diluted or dissipated by lengthy, uncompensated proceedings to fix or defend a rightful file claim." 28 Cal. Rptr. 2d at 414 (citation omitted).

Once Plaintiffs made it clear that reasonableness was an issue upon which they would present evidence, all bets were off, so to speak, as to Clary's response. Both sides hired experts; both sides conducted discovery even to the point of having to appear in Court on a discovery motion. Clary responded to this issue in the same manner that he litigated this entire case, with a meticulous thoroughness that was time-consuming and expensive. For instance, he filed two briefs in support of his post-trial expenses, copying the Court with dozens of cases from all over the United States to support each and every argument.

The Court will make one adjustment to his fees based on his statement that he and his expert spent seventeen hours preparing for the August 12th hearing. *See* statement attached to Clary's Affidavit in Support of Supplemental Award, August 8 and 10, 1998. Mr. Clary did not need that much preparation given his performance in the past. The Court will reduce his post-trial fees by $2,000.00. Although the fee for Mr. Molster seems high, the Court will let that fee stand since Clary really had no choice but to put on an expert in response to Annino.

### Final Statement

The Court accepts Clary's fees through trial in the amount of $138,506.00 minus $1,000.00 and his costs of $9,529.21 minus $875.50, for a total of $146,159.71.

The Court accepts Clary's fees through August 12, 1998, in the amount of $22,837.50 minus $2,000.00 and his costs of $5,500.00, for a total of $26,337.50.

The total fees payable by the Plaintiffs to the Defendants are $158,343.50. The total costs payable by the Plaintiffs to the Defendants are $14,153.71; the total for all is $172,497.21.