# CIRCUIT COURT OF FAIRFAX COUNTY

United Healthcare Services, Inc.,
and William L. Griffith & Co.
of Va., Inc.

    v.

B. F. Saul
Real Estate Investment Trust

    v.

Trammel Crow
Real Estate Services, Inc.

Case No. (Law) 174215

■■■■■■■■

BY JUDGE R. TERRENCE NEY

October 26, 1999

    This matter comes before the Court on Plaintiff's Motion to Strike Saul's Expert Witness Designation and Defendant's Motion to Deny Plaintiff's Motion to Strike and various responses and replies thereto.

    The issue actually presented for decision is whether Defendant identified its expert witness, Wyatt B. Durrette, Jr., in a timely manner and, if not, whether Plaintiff is so prejudiced by an untimely identification that Mr. Durrette should be precluded from testifying at the evidentiary hearing set for November 1, 1999.

    First, it is necessary to determine when Defendant was obligated to identify its expert witness and if it complied with that obligation. The Court

set no specific deadline for the designation of expert witnesses.[1] Therefore, Defendant's obligation to identify Mr. Durrette stems from its obligation to respond to interrogatory number 1 contained within plaintiff's First Set of Discovery Requests to defendant B. F. Saul in Connection with Evidentiary Hearing on Attorneys' Fees ("Plaintiff's Discovery Requests"). Plaintiff's Discovery Requests were served on Defendant, according to the attached certificate of service, on September 15, 1999, by facsimile and first-class mail. Plaintiff has produced a facsimile transmission confirmation of this mode of service. Rules 4:8 and 4:9 require a party to respond to interrogatories and requests for documents within twenty-one days of service of the requests. Rule 1:7 allows an additional one day in which to respond when service is made by facsimile or an additional three days when service is made by first-class mail. Consequently, Defendant's responses to Plaintiff's First Discovery requests were due on October 7, 1999. According to the certificate of service attached to Defendant Saul's Objections and Responses to Plaintiff's First Set of Discovery Requests ("Defendant's Responses"), Defendant served its responses by first-class mail on October 12, 1999, five days after they were due.

Defendant asserts in its papers that October 12 was the proper due date for the responses because it allowed three additional days for service by mail.[2] Defendant is correct in its calculation but clearly overlooked either the fact that Plaintiff's Discovery Requests were served by facsimile or the provisions of Rule 1:7 concerning service thereby. As Plaintiff, in its papers concerning this dispute, similarly overlooked the relevant provision of Rule 1:7 concerning service by facsimile, the Court declines to reach the conclusion that Defendant's late response was intentional.

However, the Court is particularly disturbed by Defendant's service of Defendant's Responses to addresses it knew were obsolete (with the excuse that it as copying from an old document) and its subsequent attempt to excuse that error by asserting that *by serving Mr. Ledoux, the only member of the Virginia bar who took an active part in the trial of this matter,* it had complied with Rule 1A:4. While Defendant's reading of Rule 1A:4 is correct in theory,

---

[1] Notwithstanding the various conflicting and self-conflicting representations made by counsel concerning such a deadline, the Court did not set a specific deadline during the conference call.

[2] Discovery requests served on September 15, 1999, would have been due on October 6 if served by hand delivery. The three additional days allowed for service by first-class mail would ordinarily make the responses due October 9. In 1999, October 9 fell on a Saturday, and Monday, October 11, was a court holiday, making responses otherwise due on October 9 due on October 12.

if discourteous, the certificate of service appended to Defendant's Responses makes it clear that *Defendant did not even serve Mr. Ledoux.*

Next, the Court must address any prejudice potentially caused by Defendant's late response. Plaintiff argues that Defendant's late response prejudiced it because it could not take Mr. Durrette's deposition; because it instructed its own expert to stop work and determined not to call him; and because its expert does not have Defendant's expert's work product. Defendant counters that Plaintiff has no right to take the deposition of an expert without leave of court and that even if Defendant's Responses had been served on October 6, when Plaintiff contends they were due, Plaintiff would not have had time to file a motion for leave to take Mr. Durrette's deposition and have that motion heard prior to the close of discovery on October 15.

After due consideration of all of the arguments raised by both sides, the potential prejudice to Plaintiff if Mr. Durrette testifies, the potential prejudice to Defendant if Mr. Durrette is precluded from testifying, it is the decision of this Court that (1) Defendant shall deliver, by hand, to the offices of Katten Muchin & Zavis at 1025 Thomas Jefferson Street, N.W., Washington, D.C., to the attention of S. Scott Morrison, Esq., and/or Nicole Kobrine, Esq., by 5:00 p.m. on Wednesday, October 27, 1999, any non-privileged documents responsive to Plaintiff's Discovery Requests that it has not already produced; (2) that Defendant shall make Mr. Durrette available for deposition prior to the commencement of the evidentiary hearing on November 1, 1999[3]; (3) that at least one attorney for the Plaintiff shall make himself or herself available to take that deposition; and (4) that Mr. Durrette shall be allowed to testify at the evidentiary hearing.

November 18, 1999

This matter was heard by the Court on November 1, 1999, for the presentation of proof by the plaintiffs as to the reasonableness of the attorney's fees sought by them.[4] The plaintiffs offered the testimony of counsel for

---

[3] As Defendant has offered to do in its letter to the Court and counsel of today's date.

[4] The Court ruled in its opinion of August 18, 1999, that United HealthCare Services, Inc., ("UHC") and William L. Griffith Co. ("Griffith") were entitled to an award of attorney's fees against defendant, B. F. Saul, Inc., as sanctions pursuant to Virginia Code § 8.01-271.1 (1999 Cum. Supp.) [49 Va. Cir. 436].

Griffith and UHC.[5] Plaintiffs' Exhibits 1-4 and 6-8 consisted primarily of billing records from counsels' respective law firms.[6] At the conclusion of UHC and Griffith's evidence, Saul offered an expert witness who testified that in his opinion, a reasonable attorney's fee for performing the legal work involved in this litigation should have been between $70,000.00 and $100,000.00, a sum approximately one half of that sought by UHC and Griffith. The reasonableness of the hourly rates charged in this matter by Messrs. Morrison and Ledoux and their colleagues was stipulated to by Saul.

Three issues are presented for decision. First, whether the sanctions awarded pursuant to § 8.01-271.1 should in fact be in the amount of the plaintiffs' attorney's fees. Second, whether the attorney's fees sought by UHC and Griffith are reasonable. Third, whether UHC and Griffith should be reimbursed for attorney's fees expended in proving the reasonableness of their attorney's fees. As to the first two questions, the answers are in the affirmative, and as to the third question, in the negative.

## I. *Amount of Attorney's Fees as Sanctions*

Virginia Code § 8.01-271.1 does not specifically call for the imposition of a prevailing party's attorney's fees as the amount of sanctions to be awarded. The statute is silent. A court may choose to use the amount of attorney's fees as a starting or ending point for the amount of sanctions or may choose to disregard them altogether. Compare *Anschutz Petroleum Marketing Corp. v. E. W. Saybolt and Co.*, 112 F.R.D. 355 (S.D. N.Y. 1986), with *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640 (7th Cir. 1992). The Virginia statute providing for sanctions - as is true with its federal counterpart, Rule 11 - is not a fee shifting device. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975).

Notwithstanding, it does not strike the Court that simply because the amount of the sanctions award may also be the amount of the prevailing party's attorney's fees that such an award transforms the sanctions statute into a fee shifting statute. Perhaps if in every case an award amounted to the prevailing party's attorney's fees that would seem to be so. As the reported decisions make clear, however, not only do sanctions awards often amount to

---

[5]  Throughout this litigation, S. Scott Morrison served as lead counsel for Griffith, and C. Christopher Ledoux served as lead counsel for UHC. At the trial of August 1 and 2, 1999, Mr. Morrison acted as lead counsel for both UHC and Griffith.

[6]  At the outset of this litigation, Mr. Morrison was practicing with Holland & Knight. He joined Katten, Muchin & Zavis, his present law firm, during the course of this case. Mr. Ledoux practices with Spriggs & Hollingsworth.

sums far different than attorney's fees, but in those instances where attorney's fees are awarded, the courts examine the attorney's fees both as to their reasonableness and as to whether the amount of the attorney's fees is the proper amount of the sanctions.

Most recently, the Supreme Court of Virginia in *Cardinal Holding Co. v. Deal*, 258 Va. 623 (1999), included as the amount of § 8.01-271.1 sanctions the full amount of attorney's fees and costs and added to that sum $10,000.00 as "punishment." As a result, it is now plain that in Virginia an award of sanctions pursuant to § 8.01-271.1 may include the amount of the attorney's fees and costs expended by the prevailing party and, where appropriate, more as well. Here, the sanctions award was in the amount of the attorney's fees and costs expended by UHC and Griffith. In the opinion of the Court, that amount is the proper amount of the sanctions to be imposed in order to deter similar conduct in the future.

## II. *Reasonableness of Attorneys' Fees Sought*

Virginia has clearly established what must be shown to establish reasonableness of the attorneys' fees.[7] The Virginia requirements - which consist of seven distinct elements - have been developed through a series of decisions addressing the issue.[8] *Mullins v. Richlands National Bank*, 241 Va. 447, 403 S.E.2d 334 (1991); *Tazewell Oil Co. v. United Va. Bank*, 243 Va. 94, 413 S.E.2d 611 (1992); *Seyfarth, Shaw v. Lake Fairfax Seven Ltd.*

---

[7] The Court holds that the issue of reasonableness of attorney's fees in an award of sanctions is an issue that needs to be addressed and decided if reasonableness is, in fact challenged. The attorney's fees awarded here as sanctions were not simply to reimburse UHC and Griffith for the attorney's fees expended by them in prosecuting a meritorious action and defending against unmeritorious claims, but to deter others from engaging in the conduct that was sanctioned here. If a court deems sanctions appropriate, then it is within the sound discretion of the court as to the *amount* of the sanctions to be awarded. *Cardinal Holding Co. v. Deal*, 258 Va. 623 (1999), citing *Oxenham v. Johnson*, 241 Va. 281, 402 S.E.2d 1 (1991). That sum may or may not be the prevailing party's attorney fees. The Court in its letter opinion of August 18, 1999, invited the defendant to challenge the reasonableness of the attorney's fees being imposed as sanctions. *In re Kuntsler*, 914 F.2d 505 (4th Cir. 1990); *Brandt v. Schal Associates, Inc.*, 960 F.2d 640 (7th Cir. 1992).

[8] Twelve factors are set out in comparable federal decisions. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *Barber v. Kimbrell*, 577 F.2d 216 (4th Cir. 1978); *Hensley v. Eckerhart*, 461 U.S. 424 (1983).

*Partnership*, 253 Va. 93, 480 S.E.2d 471 (1997); and *Chawla v. BurgerBusters*, 255 Va. 616, 499 S.E.2d 829 (1998). The seven elements which must be demonstrated are:

> 1. The time and effort expended by the attorney;
> 2. The nature of the services rendered;
> 3. The complexity of the services;
> 4. The value of the services to the client;
> 5. The results obtained;
> 6. Whether the fees incurred were consistent with those charged for similar services; and
> 7. Whether the services were necessary and appropriate.

The burden of proof as to each element rests on the party seeking the attorney's fees. *Chawla v. BurgerBusters*, 255 Va. 616, 499 S.E.2d 829 (1998).

## A. *Time and Effort*

Both the testimony and exhibits offered by plaintiffs clearly demonstrate the time and effort expended by their counsel on this matter. The three plaintiffs' law firms - Holland & Knight, Katten, Muchin & Zavis, and Spriggs & Hollingsworth - have computerized billing systems. Each lawyer or timekeeper, for example, a law clerk, paralegal, or legal assistant, writes brief summaries each day of the nature of the work performed and the time spent on it. That information is entered into a computerized billing system whose software generates a monthly bill. Detailed time records produced in such a manner were submitted on behalf of all three law firms as Plaintiffs' Exhibits 1-4 and 6-8. These records reflected in great detail the specific efforts and time spent of the lawyers and other employees of the respective law firms on this litigation.

## B. *The Nature of the Services Rendered*

There was no dispute about the nature of services rendered, namely litigation efforts to recover sums of money wrongfully withheld and the defense against spurious counterclaims. Lead counsel at trial for UHC and Griffith, Mr. Morrison, described specifically the approach that he, as lead counsel, takes in every case - and took in this case - including preparing a litigation strategy, testing the theories of the case, personally deposing all

witnesses, deposing experts at the conclusion of fact witness depositions and a review of exhibits, and then organizing all of that information for trial. He identified the various individuals from his law firm who worked on the case. These included two paralegals, three law clerks, two associates, and one part-time partner.

## C. *The Complexity of the Services*

Much was made of the fact at the November 1, 1999, hearing that the Court in its opinion letter of August 18, 1999, wrote that:

> Rarely does an action involving commercial leasing, landlord and tenant, and breach of contract issues, including construction overtones, if not disputes, present such an uncomplicated set of virtually, if not completely, undisputed facts. The situation is disarmingly simple.

From the standpoint of the case that was presented to the Court for trial on August 2 and 3, 1999, those statements are absolutely correct. Yet, as Saul's expert witness, Wyatt B. Durrette, Jr., noted: "Often a case that seems simple at the time of trial is not as simple at the outset." Often a great deal of effort is required in order to make what begins as a very complicated situation become simple. Moreover, until the Friday before the Monday of trial, this case involved not only the plaintiffs' claim against Saul but Saul's two counterclaims against the plaintiffs. The nonsuiting of those counterclaims on the day of trial certainly simplified the procedural aspects of the case. A Stipulation of Facts was not entered into until the morning of trial.

Notwithstanding the straightforwardness of the facts by the time of trial, in his testimony, Mr. Morrison pointed out there were at least three "unusual factors in the case that confronted the plaintiffs at the outset."

First, UHC and Griffith, while co-plaintiffs, were actually adverse in certain respects. UHC had called upon Griffith to pay the amounts withheld by Saul or litigate the matter at Griffith's expense. The Griffith Company was not in a financial position to simply pay to UHC over $300,000 and then proceed against Saul for reimbursement for those monies. Griffith needed instead to convince UHC to let it carry the lead role in the litigation. By convincing UHC to proceed in that matter, it avoided the situation in which UHC would sue Griffith and then Griffith would sue Saul. That would have resulted in a more active role for UHC in the case and hence a greater amount of attorneys' fees. Saul sought on the morning of the trial to disqualify Mr.

Morrison from acting as lead counsel for UHC. If that motion had been granted, Mr. Ledoux would have been required to try the case.

Second, again as the Court noted in its opinion letter of August 18, 1999, this case involved "construction overtones, if not dispute." That was certainly true at the time of trial. At the outset of the matter, however, it might very well have struck one as a construction case, although traditional construction issues such as defective work, bidding problems, undiscovered conditions, delays, and the like were not really presented. Nonetheless, the case presented enough construction and landlord and tenant and contractual issues that it was the kind of case that needed to be made simple for presentation to either a court or jury.

Third, as Mr. Morrison also testified, in many respects the ultimate resolution of the case rested upon the testimony of non-parties to the case who may not have been eager to become involved in a situation where, because of existing business relationships, their interests might appear adverse to Saul. These included a construction company, Kfoury Construction; real-estate brokers who had an ongoing relationship with Saul, Smith Braden Company; and the ultimate tenant for the space, the American Arbitration Association. Mr. Morrison testified that as to the construction company in particular, there was no cooperation provided to counsel for Griffith, and all documents had to be obtained by subpoena. It turned out that the information provided by the construction company as to the lessened cost of demolition and by the American Arbitration Association that the existing improvements were unacceptable and the space had to be completely remodeled before the AAA could use it and the real estate brokers that the "lost tenant," Infotech, had never agreed to rent the space at all were pivotal to UHC's and Griffith's case. All of this showed that there were complex elements presented by this matter that might not be readily presented in similar litigation.

D. *The Value of the Services to the Client*

Obviously, the result of this litigation is that UHC will receive its wrongfully withheld portion of the tenant allowance, and, of course, Griffith is relieved of any further obligations to UHC under its indemnification provision. The value to both clients is clear.

E. *The Results Obtained*

The results obtained for both clients were favorable in all respects.

F. *Whether the Fees Incurred Were Consistent with Those Charged for Similar Services*

Both Mr. Morrison and Mr. Ledoux testified that the fees charged by them to Griffith and UHC respectively were consistent with fees charged to other of their clients for similar services.

G. *Whether the Services Were Necessary and Appropriate*

Both Mr. Morrison and Mr. Ledoux separately testified that the legal services rendered were necessary and appropriate.

In short, all seven elements set out by the Virginia cases were satisfied. And, as previously noted, the reasonableness of the rates charged by Messrs. Morrison, Ledoux and their colleagues was stipulated to by Saul. The application for the attorney's fees was also supported by affidavit filed with pleadings and brought to the Court's attention at trial on August 2, 1999.

As against this, defendant, B. F. Saul, offered its expert witness, Wyatt B. Durrette, Jr., who testified that based upon his review of the pleadings, certain documents, certain discovery materials, some depositions, and the letter opinion of the Court, that a "reasonable range" for legal fees in this matter would have been between $70,000.00 and $100,000.00.[9]

Mr. Durrette cited four specific areas of complaint which he thought exemplified that the billings were too high. These were:

1. At two out of fourteen depositions, an associate of Mr. Morrison was also present;

2. Mr. Morrison's associate was present for each of the two trial days;[10]

3. The bills reflected too many interoffice conferences between and among lawyers in Mr. Morrison's firm;

4. Some legal research and drafting activities were undertaken by partners instead of associates.

---

[9] Mr. Durrette did not base his range of fees upon a traditional lodestar analysis, number of hours expended times hourly rates. *Pennsylvania v. Delaware Valley Citizens' Council for Clear Air*, 478 U.S. 546 (1986); *City of Burlington v. Dague*, 505 U.S. 557 (1992); *Daly v. Hill*, 790 F.2d 1071 (4th Cir. 1986). An excellent analysis of the lodestar approach and § 8.01-271.1 sanctions is found in *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 41 Va. Cir. 171 (1996). Mr. Durrette was also not advised that counsel had stipulated to the reasonableness of the fees charged by UHC's and Griffith's counsel

[10] The associate who attended the depositions and trials is Nicole Lynn Kobrine who is with Mr. Morrison's firm.

Despite Mr. Durrette's qualifications and testimony, the Court did not find his opinion sufficiently persuasive to overcome the evidence submitted by UHC and Griffith.

First, as noted previously, Mr. Morrison detailed unusual aspects of this litigation that confronted him at its outset. These included the fact that it was a case involving many construction issues, a case involving the necessity of key proof from non-party witnesses, some of whom might prove to be aligned with Saul, and the fact that UHC and Griffith in some respects had conflicting interests.[11] In time, UHC agreed to have Griffith's counsel, Mr. Morrison, act as lead counsel in the litigation, and he did so through trial.

Second, the litigation was resisted in all respects by Saul, and in October 1998, Saul filed a counterclaim against both UHC and Griffith for damages. That counterclaim, which was meritless in all respects, formed the basis for the Court's awards of sanctions in its letter opinion of August 18, 1999. The evidence was overwhelming that the amount of the legal work expended by counsel was plainly necessary in order to prosecute and defend the suit on behalf of UHC and Griffith. Nothing even remotely suggests that for a case of this nature, the presence of Ms. Kobrine at two out of fourteen depositions and for two days of trial is not reasonable in every respect.

Third, much was made by Saul that this case was sufficiently straightforward so that it could have been resolved by summary judgment. Leaving aside the occasional reluctance of the Supreme Court of Virginia to uphold a grant of summary judgment, the Court finds that this case presented enough issues so that a motion for summary judgment would have been impractical without the use of deposition testimony. Permission was sought by counsel for UHC and Griffith to use deposition testimony in support of a motion for summary judgment, but counsel for Saul refused to grant such permission. Plaintiffs' Exhibit 5 introduced at trial November 1, 1999. Perhaps it would have been possible to obtain sufficient requests for admission to move for summary judgment, but whether the time expended in such a task would have been less expensive than simply trying the case on its merits is not the least bit clear.

Finally, it must be observed in this opinion, as it was in the opinion of August 18, 1999, that counsel for Griffith on April 30, 1999, advised counsel for Saul that its position in the case was indefensible and that Griffith and

---

[11] Griffith indemnified UHC against Saul's claims. In litigation of this nature, typically, the indemnitee, UHC, would institute an action against the indemnitor, Griffith, who would then bring in as a third party defendant the alleged wrongdoer, Saul.

UHC would settle the matter for payment of the tenant improvement allowance wrongfully withheld, and, in turn, UHC and Griffith would waive any claim for attorneys' fees. Saul rejected this demand, and counsel for both UHC and Griffith proceeded to prepare the matter for trial. *The vast majority of the legal expenses claimed by UHC and Griffith resulted from the trial preparation effort and trial that followed Saul's rejection of the April 30, 1999, demand.* Simply put, it was Saul's actions alone that generated much of the attorneys' fees expended by UHC and Griffith. Saul's complaint about an absence of reasonableness after April 30, 1999, in particular, strikes the Court as disingenuous.

In sum, both UHC and Griffith have plainly and fully met their burden of proof in demonstrating the reasonableness of the attorneys' fees expended in the prosecution and defense of this matter. Those fees from October 23, 1998, the date Saul's grounds of defense and counterclaim were filed, until August 9, 1999, the filing of post-trial memoranda, amounted to $251,018.16.

### III. *Recovery of Attorney's Fees Expended in Establishing Reasonableness of Attorney's Fees*

UHC and Griffith contend that their counsel fees expended since the order of this Court granting them judgment should also be awarded to them because those fees were incurred in proving the reasonableness of the fees initially awarded by the Court. Saul contends that those fees are not recoverable, pointing the court to several federal decisions. *Pan-Pacific & Low Ball Cable v. Pacific Union*, 987 F.2d 594 (9th Cir. 1993); *In re Kuntsler*, 914 F.2d 505 (4th Cir. 1990); *Practice Management Assoc., Inc. v. Walding*, 138 F.R.D. 148, 149 (M.D. Fla. 1991); and *Unanue Casal v. Unanue Casal*, 132 F.R.D. 146, 151 (D. P.R. 1989). All parties agreed that as of the time of the hearing, there was no controlling authority from either the Supreme Court of Virginia or the Court of Appeals of Virginia. UHC and Griffith cited three Virginia Circuit Court opinions. *Lewis v. Lambert*, 26 Va. Cir. 109 (Richmond, 1991); *Barton v. Richmond Mem.*, 1990 WL 751312 at * 2 (Cir. Ct. Richmond, Oct. 4, 1990); *Bremner, Baber & Janus v. Morrissey*, 19 Va. Cir. 324 (Richmond, 1990). None of those cases addresses the precise issue presented here.

Simply put, the issue for decision is whether attorney's fees expended in demonstrating the reasonableness of attorney's fees awarded as sanctions should be added to and included as part of the sanctions award, or whether the test as to the inclusion in the award of those attorney's fees should be the same test as applied to the initial award, namely, whether conduct of counsel or a

party has run afoul of § 8.01-271.1 and merits an award of sanctions. In my opinion, the latter standard is the test to apply. This is so for several reasons.

First, an award of attorney's fees sanctions is not an award that grows out of an actual relationship between the parties or other statutory scheme that would otherwise entitle a prevailing part to *all* reasonable attorney's fees. To the contrary, attorney's fees awarded as sanctions result from specific conduct of counsel and/or a represented party. Such conduct may or may not pervade the entire course of the litigation process. In the Court's opinion, as to the underlying case, it did; as to the reasonableness case, it did not.

Second, to automatically include as sanctions sums incurred in challenging the fact of the sanctions or the reasonableness of the amount awarded would, in the Court's opinion, impermissibly chill a litigant from testing either the fact or amount of the sanctions award.

Third, the cases are plainly divided. As noted, a number of courts have refused to permit a party to recover fees incurred in prosecuting a sanctions motion. *Pan-Pacific & Low Ball Cable v. Pacific Union*, 987 F.2d 594 (9th Cir. 1993); *In re Kuntsler*, 914 F.2d 505 (4th Cir. 1990); *Practice Management Associates, Inc. v. Walding*, 138 F.R.D. 148 (M.D. Fla. 1991); *Unanue Casal v. Unanue Casal*, 132 F.R.D. 146 (D. P.R. 1989). Other courts - the majority - have permitted the recovery of attorney's fees expended in prosecuting the Rule 11 sanctions. *Silva v. Witschen*, 19 F.3d 725 (1st Cir. 1994); *Kirk Capital Corp. v. Bailey*, 16 F.3d 1485 (8th Cir. 1994); *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640 (7th Cir. 1992); *Gutierrez v. Hialeah*, 729 F. Supp. 1329 (S.D. Fla. 1990); *Blossom v. Blackhawk Datsun, Inc.*, 120 F.R.D. 91 (D.C. Ind. 1988); *Knop v. Johnson*, 667 F. Supp. 512 (D.C. Mich. 1987); *Margolis v. Ryan*, 140 F.3d 850 (9th Cir. 1998). If a trend is discernible, it would appear to be one to include the attorney's fees and costs sought in prosecuting the sanctions motion.

In *Cardinal Holding Co. v. Deal*, 258 Va. 623 (1999), the Supreme Court of Virginia addresses this precise issue. Citing a recent decision from Ohio, *Scheiderer Assocs. v. City of London*, 689 N.E.2d 552 (Ohio 1998), the Supreme Court stated as follows:

> In empowering a court to award an "appropriate sanction," Code § 8.01-271.1 also authorizes an award of reasonable attorney's fees and reasonable expenses, "incurred because of the filing of the pleading." We read the quoted language as permitting not only a recovery of such fees and expenses incurred in defending against an unwarranted claim, but also a recovery of those fees and expenses incurred in

pursuing a sanctions award arising out of such claim [citing *Scheiderer*].

The permissive grant of authority read by the Supreme Court comports with my view of the matter. If warranted, attorney's fees may be imposed to reimburse those fees and expenses incurred in pursuing a sanctions award. If unwarranted, they need not be. Because of my view that the permissible imposition of such fees as further sanctions needs to be determined by a separate test as to the nature of the challenge to the award, I choose not to permit a further award of sanctions in this case as to those fees and expenses incurred by UHC and Griffith in pursuing the sanctions award.

It is the opinion of the Court that sanctionable conduct has to be judged with respect to specific activities of counsel and/or a party to a matter. There may be, as in this case, a clear demarcation between litigation efforts involved in the underlying case and litigation efforts involved in testing the reasonableness of the sanctions award. Although it is clear that even as to the testing of the reasonableness of the fees, every step of the abbreviated litigation process was hotly contested,[12] nonetheless, there is a difference between zealous representation on behalf of a defensible or arguable position and zealous representation on behalf of a plainly untenable and unreasonable position. A further award pursuant to Code § 8.01-271.1 is permitted but not mandated. In the Court's opinion, a further award is not justified.

### Conclusion

For these reasons, it is the opinion of the Court that UHC and Griffith's claims, pursuant to § 8.01-271.1, for attorney's fees and costs are granted in the sum of $251,018.16 against Saul.

---

[12] See opinion letter of Court dated October 26, 1999.